Thank you, Your Honor. George Carpinello, Boies, Schiller, and Flechner for the plaintiff's objector's appellants. And, Your Honor, I wish to reserve five minutes of my time for rebuttal. Your Honors, there's two situations which this Court has said and other courts have said where a approval of a class settlement or a class determination requires special review by the Court. And that's in the case where there's a settlement class, that is, there's not been a trial, the class comes before the Court seeking certification at the same time as settlement, and secondly, when we have incentive awards involved. We have both of those situations here. Moreover, we have several factors which demonstrate why particular review is required here. First, we have a situation where there was an unethical and illegal payoff to the settlement. Second, this is a case where there was a settlement that amounted to less than one penny on the dollar. Third, the claims process was defective because it required class representatives to certify to something they could not possibly know. Fourth, the structure of the settlement created a conflict within the class by creating so-called actual harm categories, which took money from other class members to those who purportedly had suffered actual harm in a statutory damages case. With regard to the incentive awards, Your Honor, this Court held in Rodriguez that incentive awards must be reviewed with particular care because of the possibility that an incentive award will create a conflict between class representatives and the other members of the class. Does the settlement agreement actually condition the incentive awards on supporting the settlement? It does, absolutely. It says to the named plaintiffs, in support of the settlement agreement. And we know that they intended that because in all the other cases where these class counsel have participated in class actions, none of the settlement agreements say that. We also know that that language was the white plaintiffs consistently that they would lose their incentive award if they did not approve of the settlement. Well, okay. So isn't it a statement of fact, a truthful statement that if they did not participate in the settlement, they would not get an incentive award? It is not a true statement of fact because as a matter of law, they could have provided that named plaintiffs for their work will receive an incentive award. The purpose of an incentive award is not to induce somebody to agree. It need not even and should not even be conditioned on agreement. As Professor Rubenstein says, I have never seen, and he actually did a survey of 50 cases, I have never seen a case where an incentive award is conditioned on the named plaintiff agreeing to the settlement. But if the name, I mean, if you don't go along with the settlement, you're not going to get anything, right? That's not true. In both Ace Heating and Sperry, they say that class representatives who object may still receive an incentive award. The reason for the incentive award, again, is not to agree to a settlement. It's to say if there is a settlement, it's appropriate to give you some sum of money in recognition of the services which you have performed. As Professor Rubenstein says, you never want to condition that on a particular decision because if you condition it on them agreeing, you rob them of their independent judgment. The reason the class representatives are there is to exercise independent judgment on behalf of the entire class. If you say to a representative, you must agree or you will not get the $5,000, or as settling counsel said to Mr. Lovell on the telephone call, are you sure you don't want to agree? Because you are jeopardizing your chance to get an incentive award. They conditioned it, and they placed that language in the settlement agreement after learning that the white plaintiffs had a problem with this settlement. The white plaintiffs, incidentally, are the majority of the class representatives. The named plaintiffs, five of the nine named plaintiffs, did not like this settlement. And the sequence of events, if I might, Your Honor, is particularly telling. On February 6th, settling counsel sent a letter to the white plaintiffs saying, we are going to ask for a $5,000 award on your behalf, but do not consider this in your determination as to whether to approve the settlement. On March 23rd, after learning unequivocally that the white plaintiffs do not approve of the award, they send another letter which says, you cannot make a determination as to this settlement until you see all the terms. If you do make a determination before you see all the terms, your qualifications as a class representative will be called into question. And then third, you can be replaced. You as a class representative can be replaced. And then they have a meeting on April 16th at which the settlement counsel sit down with two of the five white plaintiffs, and they say to them, we see no circumstance under which you can get this $5,000 if you disapprove of the settlement. There will be a settlement. We have the votes. We have people who approve it. But you will not get it unless you approve of the settlement. In fact, yes, Your Honor. Counsel, could I ask you a question, please? Let's assume, just for sake of argument for a minute, that the panel agrees with your argument that the conditional incentive payments conditioned on a representative approving the settlement renders those representatives inadequate because they can't give a judgment on parallel interests with the class. Assuming that we decided that, what's the result then? The result. What else has to be decided? And what do we have to do? The result is there is no settlement because there is no class representative who was not affected by this who approved the settlement. All four of the remaining class representatives signed on to the settlement, and their counsel signed on to the settlement. All four submitted affidavits in the trial court which said, I approve of the settlement. I am aware of the incentive award. I am aware of the fact that the incentive award is conditioned upon approval. And they also say, of course, which is legally irrelevant, I was not influenced by that. As Rodriguez points out, that's a meaningless statement in the context of a conflict of interest. Indeed, this case is Rodriguez squared because in a Rodriguez, you had a situation where the court held that the arrangement for the incentive awards could create a conflict because it would possibly deprive the named representatives of seeking an amount higher than their structure would allow. In this case, we have the settling attorneys actually using the conflict. They actively, affirmatively use the conflict. They dangle it in front. They weren't in any way bashful about what they did. More than once, they said, you will not get it. You will not get this unless you approve of the $5,000. Their intent was, their very intent was to create of all the named plaintiffs. Why would lawyers do that? Good question, Your Honor. I ask it seriously. I will tell you why we believe. And again, you're asking me a question as to what their motivation was. Well, that's part and parcel of everything that's gone on in this lawsuit from the way I read the file. Here's the reason. Leith Cabreja, which is co-counsel for the white plaintiffs, was left without a client. Leith Cabreja had no client. All five of their clients said, do not approve of this settlement. Leith Cabreja, nonetheless, went ahead, drafted a settlement agreement, and also was at these meetings where he threatened his own clients with loss of the $5,000. They were desperate to peel off at least one or two of the white plaintiffs, at least so Leith Cabreja could go into the settlement with an actual client and can say, I'm acting on behalf of my clients. Because, in fact, they're acting directly contrary to the interests of their clients because their clients were telling them, do not approve this settlement, and they were going ahead drafting the settlement agreement. It put them in a very awkward position. All of that sounds like kind of an extended dissertation on conflict of interest by counsel. No question. Well, then what was done about bringing that to the attention of the trial judge who had the responsibility for the case? We brought attention to the trial judge immediately. And what did he do with it? Just toss it aside? Is it irrelevant? He heard argument, and then he wrote a final opinion, which basically did not even address the issue. In his final opinion, he characterized the issue of that the white plaintiffs wanted money, too. And he said, if you wanted money, you could have asked the court. Of course, that's not the issue at all. I urge you, Your Honor, because I think your look at the district judge's final decision approving the settlement, and I ask you to find anywhere in there his address of this issue, or even the mention of Rodriguez or the mention of any of these facts. Mr. Carpinello, you can lower your voice. I'm sorry. I get a little excited, I think. Yeah. Okay. I did look at the order, and he didn't address it. Did you raise it to him below? Absolutely. The first brief we filed, I was going through the sequence of events of what was happening in February, March, and April. Lief Cabreja files the settlement agreement on April 24th, and originally was going to ask the court for a hearing on April 27th. Because of a timing conflict, the hearing was set for, I believe it was May 4th. We asked for an extension of time. The judge denied it. He preliminary approved the settlement in about a 40-page order that was drafted by these people. We moved for a hearing on April 27th. The first brief we filed, we raised this issue. The very first brief. That was in May of 2009. We addressed it in 2010. We addressed it in 2011. It must have been in four or five briefs. In fact, we argued this. We had a whole argument about this, and the settlement counsel stood up and said, you know, I never really understood their argument. Can I have further briefing? And the judge gave him yet further briefing. And they put in a whole set of affidavits from their people saying, we weren't influenced by this. We knew about it. We weren't influenced by this. None of the facts that I just recited to Your Honors about what settlement counsel did is rebutted. They do not rebut, they do not contradict the fact that these statements were made, that this money was offered as a condition for settlement, that it was dangled in front of them, and that their clients signed the settlement agreement knowing the language in the agreement. Counsel, Judge Gould has a question on this. Again, assuming we accept your argument on this, and it goes back to the district court, practically what happens then? Can the plaintiffs just, I mean, can the other plaintiffs, the settling plaintiffs, just remove that provision from the agreement and try to do it all over again? No, they cannot. I think Rodriguez is very clear on that. Rodriguez says, you class counsel, you class representatives, your independent judgment is conflicted. You're out of the case. You're gone. What happens when we go back? We still have five named plaintiffs who want to pursue the case. They want to proceed to trial. Or proceed to trial or a settlement that is more than a penny on the dollar. This case is less than a penny on the dollar. So let me ask you this. On the substance of the claim, how do the class members have standing? How do they show that they're injured? First, excellent question, Your Honor. By the defendant's own records, they determined, they pulled out every single person who had a file to bankruptcy and their information at the defendant's file showed they had pre-bankruptcy debts that were not marked as discharged. And they searched the file for any other exclusion. Would there be any reason, such as student loan support payments, that would justify not discharging the debt? They checked their own files and they found 15 million people who were subject to that. It's a statutory damage case. All that a plaintiff has to prove is that a credit report was issued with a credit line that wrongfully stated that my debt was still owing or charged off. And they have to prove it was willful. And they have to prove it was willful. Unquestionably was here. Well, okay. They're going to have to show willfulness on the part of the defendants. And then you're saying the harm is simply that a credit report was issued to somebody about this person, whether in the context of buying a car or whatever, getting a loan, whatever. And that is harm sufficient to confer standing? Unquestionably. As this Court has said many times, and the cases are cited in our brief, this is a statutory damages case. Congress has made a determination that these people are harmed. If you look at the Stan Smith Declaration, he says, as a class, a rough estimate, this group as a class was harmed $3 to $5 billion. It's very difficult for an individual plaintiff to prove that they were harmed because they don't – first of all, they never see the credit report. These credit reports don't exist anymore. And they never would have gotten them anyway. They may get a letter that says adverse action, but it doesn't tell you why. It doesn't – and it may say bankruptcy, but it won't tell you and you would never know. It's because a particular credit line on my report was incorrectly cited. And Congress has said that is harm enough. Because we rely on these defendants to have an accurate – the maximum possible accuracy is what the statute says. The maximum possible accuracy. And they knew for years – it's all the Stockdale affidavit, the Stockdale deposition. All three of the representatives said we knew about the problem. We didn't do anything. Judge Carter below said halfway through the case, you've known about this for a year and a half since the case has been filed. You've still done nothing. That's an end. So that was taken care of by the injunctive relief settlement, which no one is appealing here. Correct, Your Honor. But – and I see that my – I'm cutting into my five minutes. Can I just – so is someone going to argue Mr. Gentika's argument about his letter? Yes. And is someone planning on arguing – I guess if we agree with you on the first issue, the other substantive issues go away. But class notice issue, maybe. No, I guess that would – because it was only in the context of the settlement, right? I – obviously, this is a very – we list about 18 reasons literally in our briefs why this settlement could not stand. The Gentika letter, I think, is an excellent reason because clearly – clearly what the district court did was unconstitutional. The settling plaintiffs said if you send a letter without the judge's approval, we are going to move to strike it. The judge made it clear you couldn't send a letter without his approval. Mr. Gentika wanted to send a letter to 20,000 former clients. What he wanted to say in the letter and that the judge would not let him say is I do not approve of the settlement. Right. We read the letter. Was there any finding that it was misleading? None. And if – unless Your Honor said other – I'll reserve my time for rebuttal. Did the judge, in fact, say you can't send the letter, or did he more specifically say I won't endorse you sending the letter? No. You cannot send the letter. He said you cannot send the letter. You do not have approval to send the letter. Well, not having approval to send the letter is different from saying you can't send it. And to me, there's a difference. Saying I'm not going to approve you sending that letter, that's different from saying you can't send it. He said you can't send it. You think that's what he said? Absolutely. You couldn't read the record any other way. You cannot send it. Because he said I don't want you sending a letter that said – that where you say I disagree with the settlement. That conflicts with the letter that I've approved that's gone out by class counsel. This notion of – But it conflicts with the class notice. It would violate the class notice. Which it would not. And I think Gulf Oil and Community Bank clearly say there's – that doesn't – the fact this class action doesn't deprive the class members of their constitutional right to hear from others, as long as the letter is not misleading, there was no finding at all that this letter was misleading. Okay. Thank you, Your Honor. Your Honor, if I might, I'd like to reserve three minutes to allocate to my colleague, Mr. McClune, who represents Experian. And you are Mr. Cadell? Cadell. Yes, Your Honor. Okay. Your Honor, if I might, let me start with the last point first, because I think it can be easily disposed of. The Gentika letter, in fact, Judge Carter, at the end of a daylong hearing, what Mr. Carpinello just told you is absolutely contrary to the record. It's just not true. He said the only thing that he wanted to say was that he was against the settlement. In fact, Judge Carter offered to Mr. Gentika the opportunity to send that letter with the court's imprimatur, with the court granting the order that he be permitted to send that letter. And he even said – well, and Mr. Gentika said, well, I want to be able to say I'm And he said, no. And then Judge Carter said, well, what if we put it in the first paragraph of the letter that you are against the settlement? And he said, it's still not okay. If I don't get my letter, I don't want my letter at all. So I commend to you the brief. If you look at it, you'll see very clearly. And what the court said in the end, in its order was – and this court has already found in the 23-F prior appeal, the inlocutory appeal, Mr. Gentika was not – the court said himself, Mr. Gentika is not absolutely prohibited from communicating with his former clients. The – this court found that there was no complete prohibition on his communication with his former clients. The word misleading does not appear in Judge Carter's order, but it is clear he talks about it's unbiased or it's unbalanced. It presents – it is not an appropriate perspective on the settlement. So I think that while the – he didn't use the magic word, the term is clearly there. Mr. Gentika – He says naturally – he says it presents Gentika's unopposed and naturally unbalanced viewpoint. So it's – he's saying it's his opinion that he can't disseminate, not necessarily a misleading statement of fact. Yes, Your Honor. So what's wrong with having him disseminate his opinion? Your Honor, again, it was not Judge Carter's ruling that he could not communicate with his clients. Mr. Gentika filed a motion requesting a court's authorization that he do so. He said he could communicate with his clients. He couldn't communicate with his former clients. I'm sorry, with the former clients. With the former clients. If you look at the court's order, he says at the very end he is not absolutely limited or prohibited from communicating with his former clients. He placed no restriction on communication with his clients. And in fact, of the 1,000 opt-outs in the case, some 750 of them are in fact Mr. Gentika's – were his clients. Recipients, some 2,600 of which received a letter from him. Now let me go to the incentive awards. And if I might recite, unethical and unethical, I think we went through two different experiences, Mr. Carpinello and I. And he, again, I feel like clearly misrepresented the record. The record is this. Judge Carter bent over backwards in two and a half years to examine this alleged conflict. Not only was there informal discovery afforded the objectors, in fact, we made our client, Jose Hernandez, available for a 45-minute interview, which was as long as they wanted. I mean, he would have talked longer or would have entertained them longer by Mr. Wolf and Gentika so that they could explain to him their objections to the settlement and why they thought it should not be supported. We then turned over drafts of the settlement agreements. We then, at the court's request, on order, they sought discovery. Judge Carter ordered us to prepare a privilege log of our internal communications. We did that. Judge Carter told them that if you wished to pursue some of those documents, let me know. They purposefully chose not to do so. Judge Carter then said, you have to make the settling plaintiffs available for deposition. We even went so far as to give deposition dates for the settling plaintiffs. Judge Carter told us to turn over our fee agreement with Mr. Hernandez. And he again told the white plaintiffs, the objectors, that if they wished to follow up on that, they could do so. Again, once we gave it to them, they chose not to follow up on it. The reason for that is because the fee agreement that Mr. Hernandez had stated very clearly that the only commitment we made to him with respect to an incentive award was that upon a settlement or recovery, we would petition the Court for a, quote, modest payment, close quotes. This is so far from Rodriguez. A modest payment to compensate him for the time and expenses he expended in his commitment in the conduct of the lawsuit on behalf of the Court. He acknowledged in his fee agreement that he had been promised no certain sum, that any amount he would be paid would be solely at the discretion of the Court, and that the incentive award or the potential of an incentive award would play no role in his decision to act as a class representative. Now, Mr. Carpinello has represented to you that it is undisputed that we dangled this incentive payment, that the class representatives filed declarations in which they acknowledged that. In fact, again, the record is completely to the contrary. The record is, and this is what was presented to Judge Carter, we had four hearings during the two-and-a-half-year period of time that we dealt with the approval of the settlement, that we went through the fairness process. Judge Carter issued 35 orders, some of them including providing this discovery that the objectors tactically, obviously deciding that it would not be to their What the declarations say is, in fact, I was not promised any amount of money to serve as a class representative. I'm reading from Mr. Hernandez's declaration, and this is at AER 60 through 63. I was informed that this payment, I, again, promised only that my counsel would petition the Court for a modest payment. He went on to say, when the settlement was reached on February 6th, 2009. Now, make sure your dates are right. Mr. Carpinello has also put in the record, and this was at the May 20th, 2010 hearing, one of the hearings at which we dealt with this issue. It's Mr. Carpinello who pointed out to the Court that until April 10th, none of the in them. So, again, just so we get the timeline, the settlement was reached on February 6th, 2009. On April 10th, or sometime after April 10th and April 16th, was the first time that we even put an incentive award provision in the settlement agreement. Why? Because that wasn't the focus. The focus was on getting the settlement and the allocation structure done correctly and properly for the best interest of the class. Yes, Judge? And why is it, if I can interpose the question, why is it that the incentive provision in the agreement says that they only get it if they support the settlement? It does not say that. It does not say that. Okay. What the settlement, they've conflated two things. Tell me, tell me. Yes, Your Honor. I'm looking at the settlement agreement right now. What page are we, of the settlement agreement in release, does that clause appear on? Your Honor, it would be on page, let's see, page 34 at the bottom, incentive awards to the named plaintiffs. The key to understanding this is, you first have to appreciate that when we drafted the settlement agreement, the initial drafts had all of the named plaintiffs. Named plaintiffs was a defined term. So we had all of the named plaintiffs in the original drafts of the settlement agreement. It was at, on April 9th, we received instructions, form letters, from the five white plaintiffs, form letters prepared by Mr. Wolf and Mr. Gentica, that they were not going to sign on to the settlement and that they were rejecting it and instructing their counsel. We can argue about who was their counsel, but instructing their counsel to take all steps to reject the settlement. At that point, we asked for a meeting with them. And in that meeting, we showed them the near final settlement agreement, which I believe still had their names in it. It was a defined term, named plaintiffs. I'm looking at named plaintiffs, means the settling plaintiffs, specifically Hernandez, Randall, Robleson, and Pike. Yes, Your Honor. Because it was after the meeting on April 16th that we took their names at their instruction out of the settlement agreement. Okay. But wait a second. So we have the defined term, named plaintiffs, in the settlement agreement. And then paragraph 7.5 is incentive awards to the named plaintiffs. Correct. And it's the language seems pretty clear to me that the incentive award goes to each of the named plaintiffs serving as class representatives in support of the settlement, because ones that were not in support were not going to get an incentive agreement, an incentive award. Your Honor, it doesn't say that. I'm reading it. Yes, Your Honor. What it says is the named plaintiffs. Wait a second. Wait. It says what I said. Now you're going to tell me how you interpret it. Yes, Your Honor. Okay. How I interpret it is very simple. This agreement has nothing to do with the white objectors. I don't know how to say it any simpler than that. The white objectors are not a party to this agreement. They're not mentioned in this agreement. That's clear, but it doesn't – that's quite clear. I mean, that's part of the issue, right? Yes, Your Honor. And my point is that when they raised this issue, we were the within its equitable discretion. Just a few months after this, when they raised this issue, he said the court has its equitable authority, equitable power to provide them with incentive awards if it chooses to do so, but their counsel need to apply for it. Now, this – the district court, Judge Carter, issued his order finally approving the settlement after Rodriguez I but before Rodriguez II, correct? Yes. Yes, Your Honor. So he didn't have the benefit of the language in Rodriguez II that even more severely condemned the use of these kinds of incentive awards. Well, that's interesting that you say that, Judge, because actually the language in Rodriguez II I think is interesting in that the court expressly found that it would have been within the district court's discretion, despite the disqualifying conflict, to have awarded attorney's fees to the McGuire Woods firm had it chosen to do so. Judge Real decided not to do so, and they affirmed that that also was in his – within his discretion. But actually, I found the language in Rodriguez II, I was surprised. I mean, they gave a wide – they made it very clear that the trial court had wide discretion. Of course, Judge Real did give $500,000 to McGuire Woods. Judge Real. Real. But he also – but they also made it clear that Judge Real could have given – could have done even more, because the result that they obtained, the $49 million was, in fact, far beyond the $10 million cap on the fee. And I'm citing to – this is on page 13 of the opinion. The district court could have considered this factor among others in exercising discretion, and could have reasonably concluded that McGuire Woods was entitled to some attorney's fees for its efforts and notable success in this case. But our conclusion that the district court could have reasonably taken this approach does not make its failure to do so an abuse of discretion. I'm sorry. What page are you reading from? I'm reading from page 13 – oh, I'm sorry, paragraph 13, I guess, Your Honor. And I guess it's a little unclear. On my printed copy, it's page 11. Did you print it from Westlaw? Yes, Your Honor. Okay. Your Honor, so I think that what's interesting about that, Your Honor, is it also Judge Carter spent a great deal of time on this issue, and I would refer the Court to the May 20, 2010, transcript, and particularly pages 23 and 31. But Mr. Carpinello, by the way, in that hearing acknowledged to Judge Carter that in this case. Counsel? Yes, Judge Gould. Put aside whether $5,000 is reasonable. It may be, but the question that I have is whether someone can be a representative of the class action and exercise an independent judgment about whether there should be such a settlement if they're getting an incentive award that largely exceeds the amount class members will get who aren't named plaintiffs, and if they're only going to get it if they support the settlement. Now, going back to the language that Judge Wardlaw read, I have that language in front of me, too, and like it seemed to me, it would only permit an incentive award if the name plaintiffs were acting in support of the settlement, not if they disagreed with the settlement. Here's my problem, Your Honor, and I think that reading ignores the word serving. You know, it's funny, Judge. I don't think when we drafted the agreement we had any notion at all that this would become controversial. What we were simply saying is these class representatives are entitled to an incentive award for having served in support of the settlement. Now, that applies to the class representative. The reason they're being compensated is not because they approve of the settlement or agree with the settlement. The reason they're being compensated is because they stepped forward, they gave their depositions, they answered discovery, they monitored the litigation through the course of the litigation. That's what they're being compensated for. And so they served in support of the settlement. Without any class representatives, there would be no case. So, I mean, again, I apologize if it was inartfully worded. I think much has been made of this. If you look at the declarations of the class representatives, however, the record that was before the trial court and the record that is before this court is that there was no undue influence or coercion. That, in fact, they had decided to support the settlement before this issue, before this settlement agreement was ever drafted. This came into play by Mr. Carpinello's own admission at the trial court no later, no earlier than April 10th. At that point, the settlement was reached on February 6th, or February 5th, I'm sorry. On February 6th, we had gotten approval from our class representatives. The next two months were consumed with drafting the settlement agreement, but at no point did they ever waver in that. And at no point were they ever told, you have to approve the settlement in order to get an incentive award. So, and in fact, they say that in their declarations. They also do not acknowledge. What Mr. Carpinello said is, oh, they all acknowledge that that was told, they were told that they would have to support the settlement in order to get that payment. They don't say that. They didn't say that. They never believed that. They were never told that. What they say is, even if the settlement agreement, recognizing, I think, Judge Wardlaw's point and the Court in general, that it can be read in more than one way, what they say is, even if the language in the settlement were modified to make clear that my entitlement to an incentive award would not be conditioned on my support of the settlement, after considering everything that I've read and been told about the settlement, I reaffirm my wholehearted support for it. That's what they said. They don't say that it says or that they were ever told I have to approve the settlement in order to get paid. What they say is, even if it was made absolutely abundantly clear that I wouldn't, that it would not be contingent upon that, I'm still going to support this settlement. Your Honor, this is a good settlement. In the context of the Fair Credit Reporting Act, this is one of the best settlements. It's the second largest settlement in history under the Fair Credit Reporting Act. It provides for $45 million from the three credit reporting agencies. It comes on top of a groundbreaking injunctive relief settlement. The objectors and their notion of this is a penny on the dollar, there are two parts to that. One is the numerator. The other is the denominator. They've got a $4.5 or $5 billion denominator. There's no way that there would ever be a result in this case that would result in that kind of outcome. And Judge Carter made it clear, Judge Wardlaw raised the willfulness issue. There, since Safeco, there have been half a dozen decisions around the country very analogous to this. We've cited two of them. One, I think, is particularly instructive. It's the Sheldon v. Experian case. In the Sheldon v. Experian case, the claim was made that the credit reporting agency should access and match a master death list with reports in their credit reports that consumers were deceased and that they should reconcile those two. Well, the court found that that type of cross-referencing was not required and that, in fact, that would not ever meet the willfulness standard, and the court granted summary judgment on that. That is exactly the case. That's exactly this case. The argument was made that the credit reporting agency should have to cross-reference information in order to make a determination as to whether ---- Are you eliminating Experian et al.'s time for argument? I didn't intend to. Well, you've just gone over your time. Oh, I'm sorry, Your Honor. I thought the three minutes was built into this. I'm just getting stopped now. Okay. Well, you're ---- I still had to talk like a minute ago. I apologize. I did not mean to do that. It's okay. But do you just, I mean ---- I would still like to have Experian. Well, I guess my concern is I feel like they have been made a number of accusations. Well, you have time, but that means you have to sit down. Thank you, Your Honor. Okay. Thank you. If it pleases the Court, good morning. Daniel McLoone on behalf of the defendant appellee, Experian Information Solutions, Inc. And it certainly, Your Honors, had been my intention to talk about all of the risks that the plaintiffs face in going forward with litigation in support of the district court's determination that this settlement was just reasonable. I'll just make two very brief observations about the topic that seems to be of concern to the panel and this whole question about the incentive award. I will represent to the court that during the negotiations, the defendants had no clue that there was any split amongst the named plaintiffs. In other words, we were negotiating a settlement, and there was no, you have to support it, there are some named plaintiffs who don't support it. The negotiations result in the settlement before there's even any discussion about agreeing on what incentive compensation would be paid to named plaintiffs. And there was no discussion of separating out named plaintiffs who supported it from those who didn't. And in hindsight, I can only say the following. If there was any concern that somehow whatever internal negotiations or discussions were going on that we were unaware of, it didn't deter opposition to the settlement. I mean, there are named plaintiffs who we know opposed it, despite whatever incentives or discouragements were presented. So from our perspective, it just didn't affect the negotiation process, and this Court shouldn't be troubled that it affected the reasonableness of the settlement. Now, I know my time is quite limited, and I really intended to focus on a laundry list of weaknesses that the plaintiffs face and that the district court recognized in approving the settlement. Very briefly, I'll list them. That there was a risk that they couldn't get any class certified. There was a risk that ---- That's because of the standing issue. No, I think the manageability issues were huge here, Your Honor. The objectors would have you believe that we can identify who has an inaccurate credit report by looking at the defendant's files, and that's just false. In other words, there was a potential group of class members of 15 million, but you can't recover unless you can establish that one of the defendants issued a credit report about you that was inaccurate. And that is something that's going to be hugely difficult to manage on a class basis. Don't the credit reporting agencies have copies or records of the credit reports that they issue? No. The copies are not maintained. So how does it work? Well, we have historical records of what was in our files, but the reality is proving the actual content of an historical credit report, particularly from my client experience, is incredibly difficult and would be very difficult to do on a class basis. The suggestion that merely because we know there was something in the consumer's file that was a debt that had existed before the bankruptcy and there was no indication on that debt that it had been discharged, that that means that that item was inaccurate if it was included on a credit report, is just false. Are you representing that your client does not keep records of credit reports that it issues to people in connection with loan applications, mortgages? Absolutely. My client issues over a million credit reports a day. Right, but wouldn't you have an electronic record of it? No. There's no electronic record. There's no record. No, none. There's no business purpose for keeping it. The people who receive the credit reports may well have copies. I think particularly if you deny a consumer credit on the basis of a consumer report, you're required to maintain it in your files as a lender for something like two years. But that just goes to the manageability problems of a huge class of 8, 10 million people, 15 million people theoretically, trying to prove a factual question. What was the content of a particular credit report and was there something inaccurate in it? So quite apart from the standing issue, virtually impossible to manage the resolution of these factual disputes. So I can give you a quick laundry list of the types of credits that are. Counsel, Judge Gould, if I could interject. Of course. It seems to me the point you're making, you know, really goes to whether the $45 million figure is a reasonable settlement figure in light of the true exposure given all the problems with the case. Yes, Your Honor. Whether that's true or not, it doesn't really answer whether class representatives are adequate representatives. If they have a conditional incentive award payment that will be made to them upon approval of a settlement, that's far in excess of the amounts that the non-name members of the class are going to get. I think I accept the premise that you're making, that these are, that no matter how fair and reasonable the settlement is, it doesn't necessarily mean that they're an adequate class representative. And I understand that, but I do think it's relevant. I mean, the fact that they agreed to the settlement before there was any discussion, we certainly hadn't agreed to any particular incentive award when the underlying economics of the settlement had been agreed upon. All right. Well, I think you've exceeded your time. And also, I know that our panel has read Judge Carter's order approving the settlement and addressing all of those issues and problems. You can tell by our questions we know what all those manageability issues are. Thank you, Your Honor. Thank you very much, and I'll give a brief time for rebuttal. Thank you. Thank you. Thank you, Your Honor. First, with regard to standing, I think the standing issue is resolved by the Edwards First American case, where this Court held that if Congress provides a statutory remedy, by definition they've been harmed. And this is clearly classically within that. Mr. McClune, I think, really doesn't, with all fairness, is really a little disingenuous in answering Your Honor's question. They don't have the report, Your Honor, but they have the records that were extant when the report was issued. And they have a record of when they issued the report, so they knew it was in their files when they issued the report, and that's exactly how they came up with 15 million people. Have they produced those? No, they did not produce them. That's another one of the problems. We haven't even gotten hardly into the merits discovery. We don't have it. If we had it, we could have tested all his parade of horribles of all the things about manageability. This Court and many other courts have said manageability is a comparison between class action and an individual case. They stand here saying to you that it's better to try 15 million cases, 15 million juries to determine whether they engaged in willful misconduct in one case, trying that common issue, and then going through the very ministerial task of going through files to see if people meet the definition. Presumptively, all 15 million people meet the definition. With regard to Mr. Goodell's statement that this was kind of an inadvertent thing in the agreement, I think that's belied by the record. First of all, he's done over 30 settlement agreements. He never put this in. Interestingly, he explained to the district judge why he did it in this case. He said on the May 20th hearing, transcript volume 2 at page 36, that we did it here, we put the language in here about in support, because we had the interesting, we had the unique circumstance of class representatives who did not support it. Exactly. He put it in there because he wanted to distinguish between those who supported it, they'll get the five, and those who don't support it don't get the five. Moreover, the fact, the language in support, the fact that it wasn't inadvertent is because they kept mentioning it. The lawyers kept mentioning it to the white plaintiffs. And the Hernandez and the Pike affidavits all acknowledged that it's in there and they read it. He suggests now they weren't influenced. First of all, Rodriguez says whether you're influenced or not is totally irrelevant. Secondly, he has to acknowledge that class representatives performed the function all the way through the process. And they knew about this incentive award and they knew the conditions on which they were getting it. And at the time, they approved the final settlement. They put in an affidavit that said, I read the final settlement. I read this language. I approve it. So they were affected. Rodriguez says it doesn't matter whether you think, you can't put in an affidavit that says, I would have done it anyway. It's like a lawyer saying, yes, I had a financial interest in the case, but it didn't affect me. You're conflicted. You're out of the case. To answer again your question, Judge, these counsel and their clients are out of the case. There's still five representatives and two law firms, three law firms, that are prepared to proceed to this case to trial. Thank you, Your Honors. All right. Thank you. I have a question that has nothing to do with this case, but what's the best way to get from here to Albany? I'll tell you, Judge. Why would you want to go to Albany? You have to go to Albany. The best way to get there is southwest to Las Vegas, Las Vegas to Albany. There's no direct flight to Albany from, and I would take Burbank. That's the flight I'm going to be on. Or you can go take JetBlue from Burbank to JFK, and then either take a car or a flight up to Albany. Albany is about 150 miles north of New York City. I wouldn't fly to JFK, though. I've been to Albany. I just can't find a good way to get there. Anyway, thank you. Thank you. Thank you all, counsel. This case will be submitted.
judges: Haddon, Wardlaw, Gould